

*LAW OFFICES OF*
# *LOUIS D. STOBER, JR., L.L.C.*

*98 FRONT STREET*
*MINEOLA, NEW YORK 11501*

*LOUIS D. STOBER, JR*
———————

*ALYSSA F. BOMZE†*
———————

*†ADMITTED IN NY & NJ*

*WEBSITE: WWW.STOBERLAW.COM*
*TEL: (516) 742-6546*
*FAX: (516) 742-8603\**
*\* NOT FOR SERVICE OF PROCESS*

July 22, 2021

**ORIGINAL VIA ECF**
Honorable James M. Wicks, USMJ
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

> **Re:** **Chodkowski et al v. County of Nassau 16-CV-5770(JMW) : Motion for Approval of FLSA Settlement + in Support of Stipulation for Discontinuance and Motion to substitute Benjamin Mastro as the Executor for the Estate of Gary Volpe**

Dear Magistrate Judge Wicks:

The Plaintiffs write this letter in support of the Plaintiff's Motion for Approval of the parties' Settlement Agreement and in support of the parties' Stipulation to Dismiss the Case with Prejudice, as well as a motion under Rule 25 FRCP to substitute Benjamin Mastro as the Executor for the Estate of Gary Volpe, a plaintiff in this case. As will be discussed further below, the settlement of the above matter for a recovery of $3,000,000 for the 242 Plaintiffs and Opt-ins constitutes a reasonable compromise in light of the several contested issues that were raised in the litigation and the maximum recovery that we believe could have been obtained had the case been successfully litigated through trial. It also was the number that Judge Brown had suggested to the undersigned and the Plaintiff representatives who were present at the settlement conference held by Judge Brown in February of 2020.

    I.      Background

The Plaintiffs, Susan Chodkowski, Gary Volpe, Matthew Sarter, Wendy Neal, Deborah Pedenzin, Rosanna Lauro, and Danielle Davidson filed this Action, on behalf of themselves and


LAW OFFICES OF
LOUIS D. STOBER, JR. L.L.C.

all others similarly situated, in the United States District Court for the Eastern District of New York on October 19, 2016. An Amended Complaint was filed on April 3, 2017. Plaintiffs were granted collective action status on July 5, 2017, claiming that the Defendant, County of Nassau, violated their rights under the FLSA, asserting overtime claims against the Defendant.

This action consists of two bases for violation of the FLSA, i.e., one cause of action for the County's failure to pay the proper overtime rate for all hours worked over forty per week and one cause of action for the County's failure to pay any compensation for the hours in excess of forty worked every 7th week when the affected employees are mandated to work a fourth 12 hour shift for no compensation.

By way of background, the Plaintiffs and all putative class/collective members are current or former Police Communications Operators ("PCOs") and Police Communications Operator Supervisors ("PCOSs") who have been under the employ of the County within its Police Department at any time since October 17, 2013 to the present. There are approximately 243 Plaintiffs and Opt Ins who have been employed by the County as PCOs and/or PCOSs within this time period. Plaintiffs allege that pursuant to a Memorandum of Understanding between the Plaintiffs' Union, the CSEA, and the County reached in 1994, the PCOs' and PCOSs' work schedule consists of a seven-week tour cycle in which during weeks one through six, a PCO or PCOS will be schedule for three, twelve-hour shifts, consisting of eleven hours of work plus a one hour unpaid lunch, for a total of 33 hours of work every week, while in every seventh week, the PCOs or PCOSs are mandated to work four, twelve-hour shifts, subject to conditions stated above for a total of 44 work-hours and four hours in unpaid lunches in the seventh week. The Defendant disputes this claim. The extra day that the PCOs and PCOSs are required to work every seventh week has been commonly referred to by the parties as a "MUD Day," "Make-Up Day" or a "Supplemental Day." Since the implementation of the seven-week tour cycle, the Plaintiffs allege that PCOs and PCOSs never received compensation for the MUD Days they worked, despite the fact that they are required to work over 40 hours every seven weeks. The Defendant disputes this claim. It was the Plaintiffs' and putative class members' position that the County's failure to pay overtime compensation for the hours worked above 40 during the seven to eight Supplemental Days worked by the PCOs and PCOSs every year constitutes a knowing and willful violation of the overtime provisions of the Fair Labor Standards Act ("FLSA"). The Defendant disputes this claim.

Also, the Plaintiffs and putative class members, further contended that the County failed to properly compensate them at the correct overtime rate for overtime hours that the County has compensated them for. The Defendant disputes this claim. The Plaintiffs allege that PCOs and PCOSs regular work schedule constituted the working of three, twelve-hour days for a total of 36 hours per week. Since the 36 hours included three hours of unpaid lunch, the PCOs and PCOSs regularly worked 33 paid hours per week, or 66 for every biweekly pay period. However, the County did not calculate the PCOs' and PCOSs' overtime rate using 66 paid hours, but instead calculated their overtime rate using a regular workweek of 35 paid hours or 70 paid hours for every biweekly pay period for those employees hired after January 1, 2011. For those hired before that date, their regular workweek's were calculated based upon 40 paid hours or 80 hours biweekly. The Defendant disputes these claims as well.



LAW OFFICES OF
**LOUIS D. STOBER, JR. L.L.C.**

In response, the Defendant moved to dismiss the Amended Complaint. The motion was denied and thereafter, the Defendant filed their amended answer denying each of the allegations made by the Plaintiffs. After engaging in extensive discovery, an initial attempt at mediation occurred which was unsuccessful.  After the failed mediation, this Court engaged in an extensive settlement conference in February of 2020 and while the parties were closer to settlement, settlement did not occur.  The final remarks of your Honor to the Plaintiff representatives was that, in the Court's opinion, the case should settle for $3,000,000.

Since the parties did not settle, the Defendant moved for summary judgment which motion was vigorously opposed by the Plaintiffs.  After the motion was completely briefed and submitted to the Court for decision, the parties agreed that this was a case that was ripe for settlement and mutual compromise, and after good faith negotiations in an over eleven hour mediation held on December 11, 2020 before Mediator Patrick Michael McKenna,  the parties agreed to the attached settlement. Thereafter, many hours were spent finalizing the language of the settlement, the consent forms, the releases and the Memorandum of Understanding altering certain conditions of employment to be FLSA compliant, between the Civil Service Employees Association, Local 830 (the Union representing the Plaintiffs and Opt-ins) and the County of Nassau.

II.      The Proposed Settlement

As alluded to above, the proposed settlement agreement awards $3,000,000 to the Plaintiffs, Opt-ins and attorneys' fees and costs of litigation in consideration of settling the above entitled lawsuit. The breakdown of the monies is as follows:

$140,000 in service fees to the Plaintiffs (the estate of Gary Volpe will not receive a service fee) and James Delahunty.  The breakdown is:

> **Susan Chodkowski**: $20,000 as a named plaintiff who, like the other named plaintiffs, put her name at risk of retaliation for stepping forward as a Plaintiff.  In addition, Ms. Chodkowski was indispensable in obtaining information necessary to start the suit, acting at all times as one of the lead plaintiffs, arranging meetings of the plaintiffs and opt-ins, getting members to opt-in to the lawsuit, review and analyze thousands of pages of discovery, reviewed the County's motion for summary judgment, met on numerous occasions with me to prepare opposition papers, reviewed damages estimates, and intimate involvement in the mediation held on December 11, 2020 leading to the $3,000,000 settlement.
>
> **Matthew Sarter:**   $20,000 as a named plaintiff who, like the other named plaintiffs, put his name at risk of retaliation for stepping forward as the lead Plaintiff.   In addition, Mr Sarter was indispensable in obtaining information necessary to start the suit, acting at all times as one of the lead plaintiffs, getting as many people as possible to opt into the lawsuit, arranging meetings of the plaintiffs and opt-ins, review and analyze thousands of pages of discovery, reviewed the County's motion for summary judgment, obtained the backup information necessary to prove damages, met on numerous occasions with me to prepare opposition papers, reviewed damages estimates, and intimate involvement in the mediation held on December 11, 2020 leading to the $3,000,000 settlement.



**James Delahunty**: $20,000, an opt-in who also played and indispensable role reviewing discovery, collating discovery, working and meeting with me in opposition to the Defendant's motion for summary judgment, worked to get as many opt-ins as possible and met on numerous occasions with plaintiffs and opt ins, reviewed damages estimates and intimate involvement in the meidaiton held on December 11, 2020 leading to the $3,000,000 settlement.

**Danielle Davidson**: $20,000, as a named plaintiff who, like the other named plaintiffs, put her name at risk of retaliation for stepping forward as a Plaintiff. In addition, Ms. Chodkowski was indispensable in obtaining information necessary to start the suit, acting at all times as one of the lead plaintiffs, arranging meetings of the plaintiffs and opt-ins, getting members to opt-in to the lawsuit, review and analyze thousands of pages of discovery, reviewed the County's motion for summary judgment, met on numerous occasions with me to prepare opposition papers, reviewed damages estimates, and intimate involvement in the mediation held on December 11, 2020 leading to the $3,000,000 settlement.

**Wendy Neal**: $20,000, as a named Plaintiff who risked retaliation for being a named Plaintiff and was involved in deciphering the thousands of pages of discovery, working on the facts re opposition to the motion for summary judgment and disseminating information to the group.

**Deborah Pedenzin**: $20,000, as a named Plaintiff who risked retaliation for being a named Plaintiff and was involved in deciphering the thousands of pages of discovery, working on the facts re opposition to summary judgment and disseminating information to the group.

**Rosanna Lauro**: $20,000, as a named Plaintiff who risked retaliation for being a named Plaintiff and was involved in deciphering the thousands of pages of discovery, working on the facts re opposition to summary judgment and disseminating information to the group.

We believe these service awards are fair and equitable for the work performed by these Plaintiffs and James Delahunty.

Attorneys' fees and costs to Louis D. Stober, Jr., Esq. $900,000 (please note this figure includes all the costs incurred by the Plaintiffs including expert witness fees in excess of $30,000 and other costs ). This Court should also take note that hundreds of hours will still be expended distributing and explaining the settlement to all of the Plaintiffs and Opt Ins, obtaining collating, recording and transmitting all consent forms, releases, w-4s and w-9s, mailings where necessary, and overseeing the distribution of all monies. For the reasons set forth below, Class Counsel respectfully submits that the attorneys' fees and expense reimbursement we seek are fair and reasonable under the applicable legal standards and should be awarded in light of the contingency risk undertaken and the extraordinary result achieved in this case. The FLSA contains the applicable fee-shifting provision for violations of the Act which provides as follows: "the court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). Plaintiffs are the prevailing party for the purposes of the statute "if they succeed on any


LAW OFFICES OF
**LOUIS D. STOBER, JR. L.L.C.**

significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Where plaintiffs obtain a favorable settlement in an action brought pursuant to the FLSA, they constitute as prevailing parties and are entitled to attorney's fees. "The fact that [plaintiffs] prevailed through a settlement rather than through litigation does not weaken [plaintiffs'] claim to fees." *Kahlil v. Original Old Homestead Rest., Inc.,* 657 F.Supp.2d 470, 474 (S.D.N.Y.2009) (quoting *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980)).

Class Counsel is entitled to reasonable attorneys' fees to compensate them for their work in recovering damages on behalf of the class of two hundred forty-two (242) named plaintiffs and opt ins under the FLSA. In determining reasonable attorney's fees courts may award a percentage of the overall recovery instead of using the lodestar method. *In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005).

The Second Circuit has noted that the trend in this Circuit is to apply the percentage method because "it provides a powerful incentive for the efficient prosecution and early resolution of litigation. *In re Lloyd's Am. Trust Fund Litig.,* 2002 WL 31663577, at *25. In contrast, the "lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in a gimlet-eyed review of line-item fee audits." *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.,* 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002); *see also, Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). This method is similar to private practice where counsel operates on a contingency fee, negotiating a reasonable percentage of any fee ultimately awarded. *See Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182,191 (2d Cir. 2008).

Under the one-third precedent, we would be entitled to $1,000,000 in legal fees plus costs but we are NOT asking for that. Rather, I am asking approval of $900,000 for both legal fees and reimbursement for the costs of this litigation. That comes to about 30% for fees and costs. I have kept contemporaneous time records throughout this litigation which Judge Brown had asked that I not include in this motion but have available if the Court wishes to review. Those time sheets show that I have expended well over the one million in legal fees I am seeking. This was a very complex case with important issues of whether the four thirty minute breaks given per day were compensable under the FLSA as being for the benefit of the employer or whether it was for the benefit of the employee. Also, there were issues of whether leave time taken should count as time worked in light of the language in the collective bargaining agreement that specifically stated that time off for leave entitlements shall be considered time worked. There was also an issue involving contractual versus FLSA overtime and whether the Defendant was entitled to any clawbacks. There was also a contested collective certification motion as well as the issue of the proper rate for the overtime paid. This was a hotly contested litigation with thousands of pages of discovery, a extremely long and complex motion for summary judgment as well as numerous other motions and applications. To reach a resolution of $3,000,000 has to be deemed a great success by any measure, especially given the fact that if the County prevailed on the break issue there would have been a -0- recovery.



LAW OFFICES OF
**LOUIS D. STOBER, JR. L.L.C.**

In lawsuits brought under the FLSA, similar to that brought herein, public policy favors the percentage-of-recovery method to be used to compensate counsel. Fee awards are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel." *Sand v. Greenberg*, 2010 WL 69359, at *3 (S.D.N.Y. 2010). The FLSA and equivalent state statutes are remedial statutes, the purposes of which are served by adequately compensating attorneys who protect wage and hour rights. *McMahon*, 2010 WL 2399328, at *7; *Sand*, 2010 WL 69359, at *3. When relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorneys general," attorneys who fill that role must be adequately compensated for their efforts. *Reyes*, 2011 WL4599822, at *7. If not, FLSA abuses would go without remedy because attorneys would be unwilling to take on the risk. *Willix v. HealthInc.*, 2011 WL 754862, at *6 (E.D.N.Y. 2011); *Sand*, 2010 WL 69359, at *3 ("But for the separate provision of legal fees, many violations of the Fair Labor Standards Act would continue unabated and uncorrected.").

The rationale to use the percentage method is consistent with the Second Circuit's decision in *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, where the court held that a "presumptively reasonable fee" takes into account what a "reasonable paying client" would pay. 522 F.3d 182, 191 (2d Cir. 2008). *Arbor Hill* supports use of the percentage of the fund method in awarding attorneys' fees. *Willix*, 2011 WL 754862, at *7; *DeMunecas v. Bold Food, LLC*, 2010 WL 3322580, at *9 (S.D.N.Y. 2010).

Lastly, the percentage method preserves judicial resources because it "relieves the court of the cumbersome, enervating, and often surrealistic process of evaluating fee petitions. *Karpus v. Borelli*, 2004 WL 2397190, at *11 (S.D.N.Y. 2004). Courts have noted that the primary dissatisfaction with the lodestar method was that it compelled the district courts to "engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Intergrated Res. Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000).

Should this Court require anything further of the undersigned with regard to his fee request, I will be happy to oblige.

After subtracting the service award and attorneys' fees from the settlement, there is $1,960,000 to be distributed to the Plaintiffs and Opt-ins. The methodology for paying the damages is as follows:

After subtracting the service award and attorneys' fees from the settlement, there is $1,960,000 to be distributed to the Plaintiffs and Opt-ins. The methodology for paying the damages is as follows:

Chodkowski Lawsuit Settlement Breakdown (the complete individual breakdown is annexed to the Stipulation of Settlement as Exhibit A)
Settlement – $3,000,000.00
Attorney's fees and litigation costs – $900,000.00



LAW OFFICES OF
**LOUIS D. STOBER, JR. L.L.C.**

Service fees – $140,000.00
Separated members and short term members with no MUD days fees – $299,970.00
Remaining amount for Active members – $1,659,950.00

The separated members/short term members $299,970 was divided as follows:
Retirees 2019:  8 for a total of $39,500
Retirees 2020: 10 for a total of $83,000
Long Term Retirees: 39 for a total of $127,920
Extended leave/off payroll: 5 for a total of $26,000
Less than 2 years on the job: 11 for a total of $550
BD & ABD: 2 for a total of $23,000

The rest of the members $1,659,950 (closest we could come to equaling out the $1,659,950)
were divided into 6 groups based on years of service.  This was the same formula used in a prior
settlement of monies owed to the PCOs and PCOSs in a different litigation.
Group A: 23+ years: 48 for a total of $624,000
Group B: 19-22 years: 19 for a total of $228,000
Group C: 14-18 years: 34 for a total of $374,000
Group D: 9-13 years: 11 for a total of $99,000
Group E: 5-8 years: 43 for a total of $328,950
Group F:  4 years:  6 for a total of $6,000

This, we believe, is the fairest method for distributing the monies to everyone involved.

### The Proposed Settlement Warrants Approval from this Court

*A.  Legal Standard for Approval*

As a general matter, because judicial approval of an FLSA settlement does not implicate
the same due process concerns as a Rule 23 case in which many of the parties to be bound by a
settlement are not present or even active in the case, the standard of review of an FLSA
settlement is far less stringent. Massiah v. MetroPlus Health Plan, Inc., No. 11-CV-05669 BMC,
2012 WL 5874655, at *5 (E.D.N.Y. Nov. 20, 2012). Therefore, Courts are encouraged to
approve FLSA settlements so long as the settlement was reached out of contested litigation
regarding a *bona fide* dispute and so long as the compromise reached is reasonable in light of the
contested issues. Sierra v. Spring Scaffolding LLC, No. 12-CV-05160 (JMA), 2015 WL
10912856, at *6 (E.D.N.Y. Sept. 30, 2015). In the present action, both of these factors have been
satisfied and warrant approval of the proposed settlement.

I have researched the issue of whether this Court must hold a "fairness hearing" post
*Cheeks* and have not found any cases requiring an actual hearing at which all collective members
must be permitted to attend. Indeed, the ONLY FLSA case I know of which had a "fairness
hearing" scheduled was in *Guerrieri et al v. County of Nassau et al*, 16-cv-06983. That was an
FLSA settlement between the County and 188 plaintiffs and opt ins holding the titles of Medic in
the Nassau County Police Department.  In *Guerrieti,* Judge Brown ordered a fairness hearing but



only 4 opt ins appeared, one to praise the settlement and three who did not object to the settlement but wished the monies had been distributed differently. Judge Brown issued an Order accepting the settlement as submitted.

I have every reason to believe the same result would occur here. Each Plaintiff has signed the stipulation of settlement and each opt in, when they opted in, signed a consent form consenting to be bound by the settlement reached by the Plaintiffs. Given that the instant settlement is contingent upon 95% of the Plaintiffs and Opt Ins formally signing a consent to settle form, we have built a "fairness hearing" into the settlement. If we do not reach 95%, there is no settlement and thus the collective will have voted that the settlement was not "fair".

In addition, there is a Nassau County Legislature meeting scheduled for August 2, 2021 wherein, I believe the *Gurrieri* stipulation will be voted on by the Legislature. If Your Honor acts quickly and approves this settlement, we can get this settlement before the same session of the Legislature for approval which will greatly expedite the processing of the consent forms and monies. For all these reasons, we ask that Your Honor not schedule a fairness "hearing" but instead review this motion and if you have any questions or issues, set up an immediate conference with counsel.

### B. Discussion of Factors Favoring Approval

As the facts above and the course of litigation should demonstrate, the present action involved more than just a contention of innocence on the part of the Defendant but an actual *bona fide* dispute between the parties. The Defendant in the course of discovery presented documentation on the number of hours worked in MUD weeks versus what was paid to the Plaintiffs and Opt-ins. Also, documentation was presented on the issue of the rate of overtime paid. In addition to disputes over liability, there was also the question of the measure of damages. The Plaintiff claimed that the violations of the FLSA were willful entitling them to go back three years and entitlement to liquidated damages equal to 100% of the monies owed.

Furthermore, the compromise that has been reached in the present action is reasonable in light of the issues in the case. If the Defendants prevailed on the break issue, the Plaintiffs would be entitled to -0- damages. By contrast, if the Plaintiffs prevailed at trial, the monetary damages were only a few million dollars more than the settlement. Given the chance of a -0- recovery and the security of having a set payment now versus waiting for years for a final outcome of this case, it behooved all parties to reach the settlement that it did.

HOW TO HAVE CONSENT FORMS AND RELEASES DISTRIBUTED:

We are proposing, in the settlement, that we be allowed to distribute the consent forms and releases (along with w-4 and w-9 forms) to each Opt In in one of three ways:
1. In person, that is, hand the forms to each Opt In.
2. Via Email, for those we are unable to give in person,
3. And finally, by mail, for those who we cannot hand to personally and do not respond to or we do not have email addresses for.



LAW OFFICES OF
**LOUIS D. STOBER, JR. L.L.C.**

In this way, we can ensure the expeditious distribution of the consent forms, releases and tax forms.

Therefore, in light of the foregoing, the Plaintiff respectfully requests that the annexed settlement and the parties' stipulation to dismiss the case with prejudice be approved. We have also annexed the new Memorandum of Understanding that would become effective after all the necessary approvals are received and we have annexed the proposed consent form and release that each Opt In would sign.

We also ask that the Court not require a "fairness hearing" as it would be duplicative of what the parties have already built into the stipulation of settlement. That is, this settlement is contingent on 95% of the Opt Ins agreeing, in writing, to its terms. If we do not meet the 95% threshold the Defendant has the right to declare the settlement a nullity. In that way, we have already built fairness into the stipulation. If 95% of the Opt Ins do not believe this settlement is fair, then they will not sign the consent form and release and the settlement will be a nullity. In other words, the Opt Ins, if they do not meet the 95% mark, will be voting that the settlement is not fair. We believe holding a "fairness hearing" will not add anything to the equation and, in reality will delay the processing and payout of this settlement by at least two months.

As to the FRCP Rule 25 motion to substitute Benjamin Mastro for Gary Volpe, deceased, while we were never served with a notice of suggestion of death by the Defendants, we believe the interests of justice and settling this case is served by obtaining an order from this Court accepting the Executor for the Estate of Gary Volpe as the proper party for the deceased and that his signature on the stipulation of settlement be accepted for all purposes. I have annexed as Exhibit A to this motion the Letter Testamentary for Benjamin Mastro for the Estate of Gary Volpe, however, I have redacted Mr. Volpe's social security number from the Letters Testamentary. The original Letters Testamentary I have has the raised seal, which cannot be seen on an ecf, however, the original can be provided to this court should it require same.

We would like to thank this Court for its time and consideration with respect to this matter.

Very truly yours,
*Louis D. Stober, Jr.*
LOUIS D. STOBER, JR. (LS-9318)

EXHIBIT A

SHORT CERTIFICATE - LETTERS TESTAMENTARY

COMMONWEALTH OF PENNSYLVANIA:

COUNTY OF WAYNE:

I, Deborah L Bates, Register of Wills in and for the County of Wayne, in the Commonwealth of Pennsylvania, DO HEREBY CERTIFY that on the 8th day of August 2018, LETTERS TESTAMENTARY on the Estate of

**GARY VOLPE**

**GARY A VOLPE**

deceased, were granted to

**BENJAMIN MASTRO**

having first been qualified well and truly to administer the same.  And I further certify that no revocation of said letters appears of record in my office.

Date of Death:       7/28/2018

Social Security No.

Wayne County No.  32732

Given under my hand and seal of office this 8th day of August 2018.

Register

NOT VALID WITHOUT ORIGINAL SIGNATURE AND IMPRESSED SEAL