UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SUSAN CHODKOWSKI, *et al.*, and all others
similarly situated,

                Plaintiffs,                              **ORDER**
                                                           16-cv-5770 (JMW)

       -against-

COUNTY OF NASSAU,

                Defendant.
------------------------------------------------------------X

**WICKS,** Magistrate Judge:

> *"Courage is what it takes to stand up and speak; courage is also what it takes to sit down and listen."*[1]

        Emergency 911 dispatchers—or Police Communications Operators ("PCOs")—serve the critically important role as gatekeepers of emergency response. They are, in the truest sense, the *first* link in the chain of first responders that answer the call for emergency services. They are the lifeline between the caller—who perhaps is experiencing the worst day of his or her life—and the police, fire, and other responding departments. Clear, effective communication is the hallmark of a good PCO. They ensure that the correct departments and agencies get dispatched and assist in ensuring that all go home safely. They are, indeed, the calm in the storm.

        Plaintiffs, PCOs and Police Communications Operator Supervisors ("PCOSs"), commenced this action nearly five years ago on October 17, 2016, on behalf of themselves and all others similarly situated, against Defendant County of Nassau[2] alleging, *inter alia*, violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for failure to pay the appropriate overtime wages for Plaintiffs' time spent performing critical policing communication duties. After nearly a half decade of ardent advocacy

---

[1] Sir Winston L. Churchill.

[2] While Plaintiffs initially filed suit against the Nassau County Police Department and the Nassau County Civil Service Commission (*see* DE 1), those Defendants were subsequently dismissed from the action (DE 64).

litigating hotly contested issues, the parties in this important FLSA action have chosen to resolve to find common ground and reach a resolution satisfactory to both sides. Before the Court is Plaintiffs' motion for approval of the proposed settlement agreement as well as Plaintiffs' motion to substitute Benjamin Mastro as Executor for the Estate of Gary Volpe for Plaintiff Gary Volpe. (DE 167.) For the following reasons, Plaintiffs' motions are GRANTED, and the proposed settlement agreement is therefore approved.

## BACKGROUND

Given its age, this case has a long and complex history. The Court assumes the parties' familiarity with all prior proceedings and will not review them in granular detail here. That said, a brief recounting of the circumstances is warranted. Plaintiffs brought this action alleging that Defendant failed to pay them and others similarly situated overtime compensation. (*See, e.g.*, DE 65.) Specifically, Plaintiffs alleged that their seven-week "tour cycle," pursuant to a 1994 Memorandum of Understanding between Plaintiffs' union and Defendant, required them to work an extra day—known as "MUD" days—every seventh week, pushing their time worked to 44 hours for those weeks. (*Id.* at 8–11.) Plaintiffs alleged that Defendant failed to properly compensate them for this overtime work, and that, additionally, Defendant incorrectly calculated the compensation rate used when it did compensate Plaintiffs for their overtime work. (*Id.* at 9.) Defendant denied each of these allegations.

On July 5, 2017 the Honorable Gary R. Brown—then a Magistrate Judge—certified this case as an FLSA collective action. (Electronic Order dated July 5, 2017.) In turn, over 200 PCOs and PCOSs opted-in as collective action members. (*See* DE 167 at 1.) Following the certification of the collective action—and throughout the lengthy discovery period—the parties actively sought settlement of this matter, attending three mediations (*see* Electronic Order dated June 22, 2018; Electronic Order dated Jan. 18, 2019; Electronic Order dated Nov. 11, 2020), as well as a judicial settlement conference (DE 123). It was only after the parties fully briefed their respective papers in support and opposition to Defendant's motion for summary judgment that they reached a settlement (Electronic Order dated Dec. 30, 2020) which, even then, took nearly eight months to finalize (DE 166).

Having glimpsed the light at the end of the tunnel, Plaintiffs[3] now move, in accordance with *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015), for approval of parties' settlement agreement. In light of the passing of Plaintiff Gary Volpe in 2018, Plaintiffs also move to substitute the Executor of his estate, Benjamin Mastro, for him as a Plaintiff in this case.

*Rule 25 Motion to Substitute*

The Court begins by addressing Plaintiffs' motion to substitute. Plaintiffs seek to substitute Benjamin Mastro, as Executor of the Estate of Gary Volpe, for Plaintiff Gary Volpe, deceased. Substitution of parties is governed by Federal Rule of Civil Procedure 25, which states, in pertinent part:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1). "[A] motion to substitute a party cannot be made until after the formal written statement of fact of death has been filed with the Court and served on the involved parties." *Unicorn Tales, Inc. v. Banerjee*, 138 F.3d 467, 469–70 (2d Cir. 1988). The service of the statement noting death on the record begins the 90-day countdown, during which a motion must be made for substitution. *See Off. Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman*, No. 13-CV-5475(JS)(AKT), 2017 WL 9485707, at *2 (E.D.N.Y. Aug. 3, 2017) (quoting *Perlow v. Comm'r Soc. Sec.*, No. 10-CV-1661, 2010 WL 4699871, at *1 (E.D.N.Y. Nov. 10, 2010)), *report and recommendation adopted by* 2017 WL 3981299 (E.D.N.Y. Sept. 11, 2017).

A proper party to substitute would include "either (1) a successor of the deceased party—a distributee of an estate if the estate of the deceased has been distributed at the time the motion for substitution has been made[;] or (2) a representative of the deceased party—a person lawfully designated by state authority to present the deceased's estate." *Natale v. Country Ford Ltd.*, 287 F.R.D. 135, 137 (E.D.N.Y. 2012) (internal quotation marks and citation omitted). Because "[l]awyers are not considered parties to the action and their authority to represent a party ends at the party's death," it follows that "a

---

[3] Although Plaintiffs submitted the present motion, the Court construes the motion as a joint application of both parties.

3

deceased's attorney is not authorized to file a motion for substitution under Rule 25 unless that attorney has been hired by the administrator of the deceased's estate." *O'Rourke v. Drunken Chicken in NY Corp.*, 19 CV 3942 (NGG) (LB), 2021 WL 1394176, at *2 (E.D.N.Y. Feb. 26, 2021) (internal quotation marks and citations omitted).

Despite passing away on July 28, 2018, a statement noting Mr. Volpe's death was never filed with the Court. Therefore, the 90-day Rule 25 countdown did not commence until July 22, 2021, when Plaintiffs appended Mr. Volpe's letters of testamentary to the present motion. (DE 167 at 11.) Although Plaintiffs initially requested that the Court simply substitute Mr. Mastro for Mr. Volpe in the "interests of justice and settling this case" (*id.* at 9), Plaintiffs' counsel—following the Court's directive—subsequently filed a Declaration from Mr. Mastro agreeing to be substituted in place of Plaintiff Volpe (DE 170). In light of Mr. Mastro's authorization, the parties' motion to substitute is GRANTED. Mr. Mastro, as Executor of the Estate of Gary Volpe, is hereby substituted as Plaintiff for Gary Volpe.

## STANDARD FOR APPROVING FLSA SETTLEMENTS

Federal Rule of Civil Procedure 41 provides, in relevant part, that:

Subject to . . . any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:

(i) a notice of dismissal before the opposing party serves either an answer of a motion for summary judgment; or

(ii) a stipulation of dismissal signed by all parties who have appeared.

Fed. R. Civ. P. 41(a)(1)(A). In *Cheeks*, the Second Circuit held that the FLSA is an "applicable federal statute" under Rule 41 because of "the unique policy considerations underlying" the act. 796 F.3d at 206. Such considerations include the laudable aim of "'extend[ing] the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.'" *Id.* (quoting *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). Accordingly, in this Circuit, Rule 41's "stipulated dismissals settling FLSA claims with prejudice require the approval of the district court or the [Department of Labor] to take effect." *Id.*

4

"Generally, if the proposed settlement reflects a reasonable compromise over contested issues, the settlement should be approved" by the reviewing court. *Ceesae v. TT's Car Wash Corp.*, 17 CV 291 (ARR) (LB), 2018 WL 1767866, at *2 (E.D.N.Y. Jan. 3, 2018) (internal quotation marks and citation omitted). In reviewing the reasonableness of the proposed settlement, courts consider the totality of the circumstances, including relevant factors such as:

> (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion.

*Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012) (internal quotation marks and citations omitted). Factors weighing against settlement approval include:

> (1) the presence of other employees situated similarly to the claimant; (2) a likelihood that the claimant's circumstance will recur; (3) a history of FLSA non-compliance by the same employer or others in the same industry or geographic region; and (4) the desirability of a mature record and a pointed determination of the governing factual or legal issue to further the development of the law either in general or in an industry or in a workplace.

*Id.* (internal quotation marks and citations omitted).

Even if an application of the *Wolinsky* factors demonstrates that the agreement is reasonable, the court must also consider whether the settlement "complies with the Second Circuit's admonitions as articulated in *Cheeks*." *Ezpino v. CDL Underground Specialists, Inc.*, 14-CV-3173 (DRH) (SIL), 2017 WL 3037483, at *1 (E.D.N.Y. June 30, 2017) (citation omitted), *report and recommendation adopted by* 2017 WL 3037406 (E.D.N.Y July 17, 2017). Specifically, courts should guard against "highly restrictive confidentiality provisions," overbroad releases that "would waive practically any possible claim against the defendants, including unknown claim and claims that have no relationship whatsoever to wage-and-hour issues," and "a[ny] provision that would set the fee for plaintiff's attorney . . . without adequate documentation." *Cheeks*, 796 F.3d at 206 (citation omitted). Related to the final admonition, courts must also ensure that any attorney's fees provided for in the agreement are reasonable. *See* 29 U.S.C. § 216(b) ("The Court . . . *shall*, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a *reasonable* attorney's to be paid by the defendant, and costs of the action.") (emphasis added); *see also Ceesae*, 2018

5

WL 1767866 at *2 (noting that courts engaging in a *Cheeks* review must "evaluate[] the reasonableness of any attorney's fees included in the proposed settlement") (citing 29 U.S.C. § 216(b)).

## DISCUSSION

*Settlement Agreement*

After nearly five years of litigating this matter, paired with protracted negotiations, the parties achieved a proposed resolution. That resolution is embodied in a settlement agreement that was executed on July 20, 2021. (DE 167-1 at 11–14.) The agreement provides that Defendant be released of liability for all claims[4] that were or could be brought based on the factual allegations in the complaint through the date that the Nassau County Legislature approves the settlement.[5] (*Id.* at 2–3.) If approved, Defendant would pay, in exchange for dismissal of this suit, $3,000,000.00 to be allocated between compensation for Plaintiffs' and Opt-ins' alleged unpaid overtime, service fees, and attorney's fees and costs. (*See id.* at 16.) The compensation allocation differentiates between separated/short term employees and active members, divvying payment based on years of service. (*Id.*) The service fees are intended to compensate Plaintiffs[6] for their efforts in pursuing this action and "putting [their] name at risk of retaliation for stepping forward as a Plaintiff." (DE 167 at 3–4.) Plaintiffs' counsel would receive $900,000—approximately one third of the settlement—which includes all costs incurred by Plaintiffs to date. (DE 167-1 at 16.) For the reasons set forth below, the Court finds that these terms are acceptable.

Reasonableness

Having reviewed the submissions—including Plaintiffs' letter and the proposed settlement agreement—the Court finds that the five *Wolinsky* factors weigh in favor of approval.

---

[4] As discussed more fully below, the release does not affect any claims brought by Plaintiffs in *Arciello v. County of Nassau*, 16-cv-3974, or *Aliberti v. County of Nassau*, 15-cv-07111, and only precludes Plaintiffs from doubly collecting damages related to MUD days worked during the release period in *Chodkowski v. County of Nassau*, 603925/2017, *Davidson v. County of Nassau*, 18-cv-1182, and *Abbanato v. County of Nassau*, 19-cv-01102. (DE 167-1 at 4.)

[5] The settlement agreement makes clear that, in addition to Nassau County Legislature approval, the parties may need approval of the Nassau Interim Finance Authority as well. (*Id.* at 3.)

[6] The parties also propose awarding a service fee to Opt-in James Delahunty for his "indispensable" work on the building the case for the Plaintiffs and Opt-ins. (DE 167 at 4.)

*First,* the settlement agreement provides for a total payment of $3,000,000.00, approximately two-thirds of which will be paid to Plaintiffs and Opt-ins as compensation for allegedly unpaid overtime. (DE 167-1 at 16.) Because Plaintiffs claim that the alleged FLSA violations were willful, a damages award at trial would allow Plaintiffs to look back three years and collect liquidated damages, doubling the damages for the unpaid overtime. (DE 167 at 8.) Plaintiffs' counsel posits—and the Court agrees—that damages at a successful trial would amount to "only a few million dollars more than the settlement." (*Id.*) Moreover, the proposed service awards, which total $140,000.00, make up 4.6% of the proposed settlement, falling within range of service fees approved in this Circuit. *See Johnson v. Brennan,* 10 Civ. 4712(CM), 2011 WL 4357376 at *2, *21 (S.D.N.Y. Sept. 16, 2011) (awarding incentive payments totaling 9.1% of $440,000.00 settlement); *deMunecas v. Bold Food, LLC*, 09 Civ. 0440(DAB), 2010 WL 3322580 at *1, *11 (S.D.N.Y. Aug. 23, 2010) (awarding incentive payments totaling 3.1% of $800,000.00 settlement).

*Second,* the settlement will allow the parties to avoid extending an already protracted litigation, and thus avert what could amount to considerable additional expenses and burdens in preparing their defenses and claims. Although agreement in principle was reached while Defendant's summary judgment motion was pending, those proceedings and outcome would have undoubtedly created greater expense and delay. Moreover, the costs of preparing and taking this case through trial and an inevitable ensuing appeal—given the complex FLSA overtime issues and number of Plaintiffs and Opt-ins—would have dramatically increased the costs to date.

*Third,* the parties faced significant litigation risk if they proceeded to trial. Defendant remains steadfast in its denial Plaintiffs' allegations, and both parties agree that a *bona fide* dispute exists as to Plaintiffs' claims. (DE 167-1 at 1–2.) Again, Plaintiffs braced for Defendant's pending motion for summary judgment at the time of settlement. And—in the event Plaintiffs prevailed at the summary judgment stage—it is certainly possible, as conceded in their motion papers, that Plaintiffs could have received *nothing*—again, after nearly five years of litigation—following an unfavorable verdict at trial. Settlement, therefore, is an effective vehicle to avoid the significant risks and costs in litigating this matter through trial for all parties.

*Fourth,* the countless hours spent zealously negotiating this settlement makes clear that it is a product of arms-length bargaining between the parties. After nearly two years of discovery, the parties attended their first rounds of mediation, which were ultimately unsuccessful. (*See, e.g.*, Electronic Order dated June 22, 2018; Electronic Order dated Jan. 18, 2019). Over a year later, the parties participated in a settlement conference with Judge Brown (DE 123) and, "while the parties were closer to settlement, settlement did not occur," (DE 167 at 3). Then, on December 11, 2020, following Defendant's filing of its motion for summary judgment, the parties engaged in an eleventh-hour mediation which fruitfully led to settlement. The parties, however, subsequently spent seven months finalizing the language of the settlement, consent forms, and the Memorandum of Understanding. As noted above, the parties were prepared to attend a settlement conference with the undersigned to iron-out the few remaining disputed provisions of the settlement agreement prior to reaching an agreement themselves on July 20, 2021. The advocacy exhibited throughout this litigation demonstrates that the settlement is unquestionably the result of arms-length negotiations.

*Fifth*, there is no indicia, nor is there even a suggestion to the Court, that the settlement is a product of fraud, coercion, or collusion.

Moreover, the *Wolinsky* factors that weigh against settlement do not compel a rejection of the proposed settlement in this case. This is a collective action which allowed other similarly situated PCOs and PCOSs to opt into the lawsuit. (DE 29.) In light of the modified Memorandum of Understanding, and the fact that the parties are currently involved in related litigation stemming from the factual allegations in the complaint, the likelihood is low that Plaintiffs' alleged circumstances will recur or that Defendant will violate the FLSA—as alleged by the Plaintiffs—in the future. While it may well behoove county police departments at large to see the maturation of the record in this case, that factor alone does not require this Court to reject the proposed settlement agreement.

Finally, the proposed settlement does not contain any of the problematic provisions outlined in *Cheeks*. The agreement does not contain a confidentiality provision. Although the settlement features a release (DE 167-1 at 5), the release merely precludes future lawsuits and duplicative damages arising out

8

of Plaintiffs' overtime claims asserted here which, under the agreement, they will be compensated for. The release does not affect any claims brought by Plaintiffs in *Arciello v. County of Nassau*, 16-cv-3974, or *Aliberti v. County of Nassau*, 15-cv-07111, and only prevents Plaintiffs and Opt-ins from collecting damages related to MUD days worked during the release period in *Chodkowski v. County of Nassau*, 603925/2017, *Davidson v. County of Nassau*, 18-cv-1182, and *Abbanato v. County of Nassau*, 19-cv-01102. Those cases, however, are not otherwise barred from moving forward, and any damages unrelated to Plaintiffs' overtime claims remain in play. "[T]he Court finds [this release] reasonable, as a narrow release limited to the claims at issue in this lawsuit does not offend *Cheeks*." *Rotthoff v. N.Y.S. Catholic Health Plan, Inc.*, 19 CV 4027 (AMD) (CLP), 2021 WL 1310220, at *2 (E.D.N.Y. Apr. 8, 2021) (citations omitted). And, as discussed more fully below, Plaintiffs' counsel has provided the Court with documentation supporting the proposed attorney's fees. The Court therefore finds that the terms of the settlement agreement are fair and reasonable.

Attorney's Fees

"In an FLSA case, the Court must independently ascertain the reasonableness of the fee request." *Gurung v. White Way Threading LLC*, 226 F. Supp. 3d 226, 229–30 (S.D.N.Y. 2016) (citation omitted). Courts in this Circuit routinely approve of one-third contingency fees for FLSA cases. *Calle v. Elite Specialty Coatings Plus, Inc.*, No. 13-CV-6126, 2014 WL 6621081, at *3 (E.D.N.Y. Nov. 12, 2014) (citing *Rangel v. 639 Grand St. Meat & Produce Corp.*, No. 13 CV 3234, 2013 WL 5308277, at *1 (E.D.N.Y. Sept. 19, 2013)); *see also Fischer v. SD Protection Inc.*, 948 F.3d 593, 602 n.8 (2d Cir. 2020) (citing cases); *Singh v. MDB Construction Mgmt., Inc.*, No. 16-CV-5216 (HBP), 2018 WL 2332071, at *2 (S.D.N.Y. May 23, 2018) (noting that one-third of settlement is "normal rate").

Even where fees are reasonable when analyzed under the percentage method, courts will additionally perform a lodestar "cross-check" and "compare the fees generated by the percentage method with those generated by the lodestar method." *Mobley v. Five Gems Mgmt. Corp.*, 17 Civ. 9448 (KPF), 2018 WL 1684343, at *4 (S.D.N.Y. Apr. 6, 2018) (citations omitted). "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the

district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000); *see also In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 388–89 (S.D.N.Y. 2013) ("Because the lodestar is being used merely as a cross-check, it is unnecessary for the Court to delve into each hour of work that was performed by counsel to ascertain whether the number of hours reportedly expended was reasonable.") (quoting *In re IPO Sec. Litig.*, 671 F. Supp. 2d 467, 506 (S.D.N.Y. 2009)).

Plaintiffs' counsel here requests $900,000. That amount includes both attorney's fees *and* costs incurred by Plaintiffs during the litigation. Specifically, Plaintiffs' counsel builds into this figure accountants fees, totaling $29,187.50, court reporter fees, totaling $1,567.05, and mediator fees, totaling $2,798.74. (*See, e.g.*, DE 169.) As a result, Plaintiffs' counsel would receive $866,446.71 in legal fees, below the standard one-third FLSA fee ordinarily approved in this Circuit. Thus, the proposed attorney's fees are reasonable under the percentage method.

Having reviewed the statements and billing records of Plaintiffs' counsel, the Court also finds the proposed attorney's fees fair and reasonable after performing a lodestar cross-check. In utilizing the lodestar approach, courts must multiple a reasonable number of hours required for the case with the attorney's reasonable hourly rate. *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011). As discussed above, Plaintiffs' counsel presents a lodestar amount of $866,466.71 by multiplying the 3,180.75 hours spent on this case with a $272.40 hourly rate—a significant downward departure from his typical partner rate of $600.00 per hour.[7] In light of the complex issues presented by this FLSA case, the duration of the litigation—which spans nearly five years—and the submitted contemporaneous descriptions of work performed, the 3,180.75 hours expended on this case is reasonable. Moreover, the $272.40 hourly rate applied here falls below the rates ordinarily accepted as reasonable for law firm partners in this district and is therefore fair and reasonable. *See, e.g.*, *Li v. Chang Lung Grp. Inc.*, No. 16 Civ. 6722 (PK), 2020 WL

---

[7] In reviewing the submitted time records—which include work performed by a paralegal and two other attorneys—the Court has extrapolated that Plaintiffs' counsel is employing a blended rate of $272.40 per hour, which is therefore the rate used in the lodestar calculation. *See In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. at 394 (comparing submitted blended rates to range of rates ordinarily accepted in the district).

1694356, at *15 (E.D.N.Y. Apr. 7, 2020) (noting that $300 to $450 is range of reasonable hourly rates for partners in FLSA cases within the Eastern District of New York); *Kliger v. Liberty Saverite Supermarket Inc.*, No. 17 Civ. 2520 (FB) (ST), 2018 WL 4782342, at *9 (E.D.N.Y. Sept. 17, 2018), *report and recommendation adopted as modified by* 2018 WL 4783964 (E.D.N.Y. Oct. 3, 2018) (noting that the reasonable hourly rates for wage and hour cases in the district has been set at $300 to $400).

Accordingly, the lodestar cross-check affirms that the requested attorney's fee of $866,446.71, awarding Plaintiffs' counsel less than a third of the settlement amount, is fair and reasonable in this case.

### CONCLUSION

Based on the foregoing, Plaintiffs' joint motions for the substitution of Benjamin Mastro for Gary Volpe and approval of the settlement agreement are GRANTED. Accordingly, the parties are hereby ordered to file the Stipulation and Order of Dismissal with Prejudice to be so ordered by the undersigned within fourteen (14) days of legislative approval.

Dated: Central Islip, New York
August 25, 2021

S O   O R D E R E D:

/s/ *James M. Wicks*
JAMES M. WICKS
United States Magistrate Judge